OTIS R. GLOVER *et al.*

*v.*

REUBEN P. LAYTON *et al.*

*Filed at Ottawa, May 9, 1893.*

1. AGENCY—*agent's duty to principal—liability of agent, to account for profits made by him.* An agent, while in the employ of his principal, can not act for himself in respect to the same matter, nor will he be permitted to make a profit for his own benefit out of the business which his principal employs him to transact, and if he makes profits, he can not hold them, but must account for them to his principal.

2. FRAUD—*sale of real estate—agent for vendor becoming a purchaser in interest.* Where the purchaser of land, knowing that he is dealing with an agent of the owner, enters into an arrangement with the agent to buy the land, ostensibly for himself, but really for the joint benefit of himself and the agent, the transaction will be such a fraud on the vendor as to enable him, on being apprised of the fact, to rescind the sale and reclaim the land.

3. But where an agent, in negotiating the sale of his principal's land, reserves no profits to himself, other than the agreed commission, and no arrangement is made whereby he is to have any interest in the land, or in the profits to be derived by a subsequent sale by the purchaser, the fact that several weeks after the sale he enters into an agreement to sell the land for the purchaser, and to receive as compensation one-half of the proceeds, after deducting the original purchase money and interest, will not invalidate the sale or authorize the original owner to set his agent's sale aside.

APPEAL from the Circuit Court of Cook County; the Hon. O. H. HORTON, Judge, presiding. ·

Messrs. MARSTEN, AUGUR & TUTTLE, for the appellants:

The agreement between Lawrence and Layton was that the latter should be paid $200, as all that he should receive in the transaction, while Layton's arrangement with Farwell gives him, in addition to this sum, one-half the profits.

Appellants were defrauded, because they did not receive the entire proceeds of the land sold. Farwell agreed to give $300 per acre and one-half the profits, of which the vendors get $300 per acre, and the agent, who was paid an agreed commission, gets one-half of the profits.

The fact that the agreement between Farwell and Layton, by which Layton gets one-half of the profits, was made after the purchase, is immaterial. It was so close in point of time as to form a part of one entire transaction, and in view of the fact that Farwell and Layton were partners in such enterprises and had made more than one similar arrangement previously to this, it is a fair inference that, though nothing was said about it, both expected it would be made when the title should have been acquired.

A vendor is entitled to know to whom he is selling. The name of the real purchaser in the case was fraudulently concealed from Lawrence, and as it was originally Farwell's suggestion to employ a man of straw, he is responsible for the concealment. Layton's false statements about Norton, made by him to Lawrence, were not acts done as Lawrence's agent to further Lawrence's objects, but were done to further and carry out the scheme proposed by Farwell; hence Farwell, as well as Layton, should abide the consequences.

Even though Farwell should not be held responsible for his share in foisting Norton upon Lawrence as a purchaser, and should be allowed to retain the interest which he claims, still Layton, with the cash commission in his pocket, should not be allowed to reap the one-half of the profits, but Farwell should account for them to the vendors instead of to Layton.

The authorities relied upon to support appellant's contention are: *Tyler* v. *Sanborn,* 128 Ill. 136, and cases there cited as follows: *Zeigler* v. *Hughes,* 55 Ill. 288; *Coat* v. *Coat,* 63 Ill. 74; *Kruse* v. *Steffens,* 47 Ill. 115; *Hughes* v. *Washington,* 72 Ill. 85; *Ebelmesser* v. *Ebelmesser,* 99 Ill. 548; *Porter* v. *Woodruff,* 37 N. J. Eq. 174.

Messrs. PECKHAM & BROWN, for the appellees.

Mr. CHIEF JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Otis R. Glover and Charles H. Lawrence against Reuben P. Layton, John A. Farwell and Horace H. Norton, praying for a decree declaring that defendant Farwell held the title to certain land in trust for the complainants, and ordering its reconveyance to them, and for other relief. Defendants Layton and Farwell appeared and answered, and the cause being heard on pleadings and proofs, a decree was entered dismissing the bill at the complainants' costs for want of equity. From that decree the complainants have appealed to this court.

The facts appearing by the record are in substance as follows: On the 20th day of July, 1886, Lawrence was the owner of a tract of land containing nineteen acres, situate near the village of Washington Heights, Cook county, which he was desirous of selling. Glover seems to have had some interest in the land, but the nature and extent of his interest is not material. Layton was then a real estate broker residing at Washington Heights and was familiar with the values of real estate and with real estate transactions in that neighborhood. He and Lawrence were well acquainted and on friendly terms.

Shortly prior to the date above mentioned, Lawrence told Layton that he would sell his nineteen acre tract for $300 per acre, and Layton afterward reported that he had found a purchaser at that price, the terms of sale to be, $200 payable when the papers were signed, $1,225 on the delivery of the deed, and the residue in three annual installments, secured by the notes of the purchaser and a deed of trust upon the premises conveyed. These terms were accepted by Lawrence, and it was agreed between him and Layton that the latter should receive $200 as his commissions for making the sale. The name of the purchaser was given by Layton as Horace H. Norton, and Lawrence, as he claims, asked Layton who Norton was, to which Layton replied that he knew nothing about him except that he

was engaged in the railroad business, although he was in fact an employe of the American Express Company, and was a relative of Layton.

A contract of purchase and sale between Lawrence and Norton was thereupon duly signed, dated July 20, 1886, and in due time, the title having been examined and approved, Lawrence cenveyed the land to Norton, and received the cash payments, and the notes and deed of trust securing the residue of the purchase money. During the whole transaction there was no personal meeting between Lawrence and Norton, Layton having taken the notes and deed of trust which Lawrence had prepared to Norton and obtained his execution of the same, and he himself delivered them to Lawrence, together with the money for the cash payments, in exchange for the deed.

The real purchaser of the land was not Norton but Farwell. Layton, as it seems, did not go to Norton to sell the land but to Farwell, and proposed to him to buy it. Farwell claimed that he did not have the necessary funds to pay the entire purchase money in cash, and that being in the mercantile business, he did not wish to have his notes for purchase money outstanding. He accordingly consented to buy the property, if it could be so arranged as to enable him to furnish the money for the cash payments, and then take the title to the land subject to a mortgage executed by some other party for the deferred payments. Layton thereupon made arrangements with Norton to take the title in his name, and after executing the notes and deed of trust for such payments, to convey the land to Farwell. This arrangement was carried out, Farwell furnishing the money for the cash payments, and the conveyance was made by Lawrence to Norton, and he, after executing to Lawrence the notes and deed of trust, deeded the land to Farwell. This latter deed expressed a consideration equal to $450 per acre, but the actual consideration paid by Farwell was only $300 per acre, a larger nominal

consideration being inserted in the deed for the sole purpose of influencing the market price of the land when Farwell should wish to dispose of it.

Farwell, as it seems, bought the land as a speculation, and the evidence shows that, within a few weeks after the purchase was consummated, he entered into an agreement with Layton, in substance, that Layton should take charge of the land for him and sell it, and that in case of sale, Farwell should first be paid the full amount of his investment and eight per cent interest thereon, and that the profits, over and above the investment and interest should be divided equally between him and Layton, the one-half of such profits to be received by Layton in full of his services and commissions for taking charge of and selling the property. At the time the decree was entered, Farwell, as the evidence tends to show, had paid all the purchase money notes executed by Norton, but that no sale of the land had been made by him or Layton.

The theory upon which the bill is framed seems to be, that Layton, though employed and acting as the agent of Lawrence, and that too upon an express contract as to his compensation for his services, was really purchasing the land in part for his own benefit, and that Farwell was not only cognizant of that fact, but actively aided him therein. It is sufficient to say that the evidence fails to support this contention. The fact that the deed from Norton to Farwell recited a much larger consideration than that for which Lawrence agreed to sell the land, is fully explained by the evidence, it being shown, beyond controversy, that the actual consideration paid by Farwell was only $300 per acre.

But the ground set up by Lawrence in his bill upon which his claim to relief is mainly based is, that Farwell bought the land in controversy in pursuance of an agreement between him and Layton, by which Farwell was to advance all the money necessary to pay for the land, and was to hold the title in trust for himself and Layton, and to account

to Layton for one-half of the profits that might be realized from the transaction, Layton in the meantime to pay Farwell interest on one-half of the purchase money.

It can scarcely be doubted that, if the case thus made by the bill were sustained by the proof, Lawrence would be entitled to relief. An agent, while in the employ of his principal, can not act for himself in respect to the same matter, nor will he be permitted to make a profit for his own benefit out of the business which his principal employs him to transact, and if he makes profits, he can not hold them, but must account for them to his principal.

Futhermore, if in the purchase of the land in question, Farwell, knowing as the evidence shows he did, that Layton was Lawrence's agent, entered into an arrangement with him to buy the land ostensibly for himself, but really for the joint benefit of himself and Layton, the transaction was such a fraud upon Lawrence as would enable him, on being apprised of it, to rescind the sale and reclaim the land.

But the evidence fails to sustain the allegations of the bill in this respect. There is no evidence tending to show that, in negotiating the sale of the land, Layton reserved any profits to himself, beyond the agreed commission, or that there was any arrangement by which he acquired or was to have any interest in the land or the profits which should be realized upon its sale by Farwell. Farwell is the only witness who testifies on the subject, and he, being put upon the stand by Lawrence, testified that there was no arrangement between him and Layton, at the time he bought the land, by which Layton was to share in the profits which might be realized from its sale, or even a suggestion on Layton's part to that effect. He further testified that the arrangement by which Layton was to take charge of the land and sell it, and receive one-half of the net profits for his commissions was entered into several weeks, and he thinks about two months after the deed from Lawrence was exe-

7—145 ILL.

cuted. We are unable to see any impropriety in such subsequent arrangement. It was a matter with which Lawrence had no concern, and which would in no event prejudicially affect any interest of his.

But it is urged that the arrangement, though subsequent to Farewell's purchase, was so close to it in point of time, that it should be deemed to be a part of the same transaction. Its following so soon after the purchase may perhaps furnish some ground for a bare suspicion that it was contemplated by the parties at the time the negotiations for the purchase were in progress. But there is nothing in the evidence which would warrant the court in finding that such was the fact. Indeed, the evidence bearing upon the question is all the other way.

We are unable to see that Lawrence was in any degree prejudiced by being kept in ignorance as to who the real purchaser of his land was. He received the price which he himself put upon the land, and it is not disputed that the sum thus paid him was at the time its fair cash value. Who the purchaser should be was a matter of indifference to him, so long as the price which he asked was paid in full.

We are of the opinion that the Circuit Court decided correctly in holding that the bill was not sustained by the evidence, and its decree dismissing the bill for want of equity will therefore be affirmed.

*Decree affirmed.*